UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------------x

HILDA L. SOLIS, Secretary of Labor,
United States Department of Labor,                    Civil Action

                         Plaintiff,                   No. CV-06-5896
                                                      (Wexler, J.) (Boyle, M.J.)

VICTOR ROSADO,

                         Plaintiff-Intervenor,

            v.

LOCAL 1104, COMMUNICATIONS WORKERS
OF AMERICA,

                         Defendant.
----------------------------------------------------------------------x

## CERTIFICATION OF ELECTION

The election having been conducted in the above matter under the supervision of

the Secretary of Labor, United States Department of Labor, pursuant to a Stipulation of

Settlement entered March 7, 2008 and Order entered March 13, 2008, in the United

States District Court for the Eastern District of New York, in accordance with the

provisions of Title IV of the Labor-Management Reporting and Disclosure Act of 1959

(29 U.S.C. § 481 et seq.) and in conformity with the Constitution and Bylaws of the

defendant labor organization, insofar as lawful and practicable, therefore:

Pursuant to Section 402(c) of the Labor-Management Reporting and Disclosure

Act of 1959 (29 U.S.C. § 482(c)), and the authority delegated to me,

1

**IT IS HEREBY CERTIFIED** that the following named candidates have been duly elected to the office designated:

George Bloom                    President

Edward Connelly                 Secretary-Treasurer

Kathleen Sims                   Executive Vice President-Education
                                Division

Attached herewith is a declaration setting forth the protests concerning violations which were alleged to have occurred in the conduct of the election and the finding of the investigations of these protests.

Signed this 23rd day April of, 2010.

Cynthia Downing, Chief
Division of Enforcement
Office of Labor-Management Standards
United States Department of Labor

2

## DECLARATION OF CYNTHIA DOWNING

I, Cynthia Downing, am the Chief of the Division of Enforcement, Office of Labor-Management Standards (OLMS), United States Department of Labor. Pursuant to a Stipulation of Settlement and Order filed in the United States District Court for the Eastern District of New York, on March 10, 2008, OLMS supervised the mail ballot election conducted by Communications Workers of America, Local 1104 (Local 1104 or union) on October 30, 2008, for the offices of President; Secretary-Treasurer; Executive Vice President Education Division; Executive Vice President Operators Service Division; and Executive Vice President Telecommunications Division.[1] After the completion of said election, two members of Local 1104 filed election complaints with OLMS alleging that Title IV of the Labor-Management Reporting and Disclosure Act of 1959 (Act or LMRDA), 29 U.S.C. §§ 481- 484, was violated during the conduct of the supervised election. OLMS investigated the allegations. As a result of this investigation, as presented herein, I find that there was no violation of the Act that may have affected the outcome of the election.

In an email received by OLMS on November 5, 2008, Jackie Hayes filed a complaint with OLMS alleging that Local 1104 failed to mail ballots to approximately 150 Local 1104 members employed in the Education Division of Local 1104 at the Albany campus of the State University of New York (SUNY). Ms. Hayes alleged that

---

[1] The offices of Executive Vice President Operators Service Division and Executive Vice

these individuals had signed membership applications prior to the voter eligibility cut-off date of August 22, 2008.  In addition, Victor Rosado, the losing candidate for Executive Vice President Education Division, filed a complaint with OLMS in an email received by OLMS on November 6, 2008, alleging that approximately 750 members in the Education Division of Local 1104 who had signed membership applications were not permitted to vote.  By way of background, the investigation showed that in or prior to August 2008, union business agents accepted membership applications from SUNY employees seeking membership in Local 1104's Education Division, the Graduate Student Employees Union (GSEU).  In order to qualify for membership in Local 1104's Education Division, a person must have been employed by SUNY in a non-supervisory position as a teaching assistant or a graduate assistant.  An employee seeking membership in the local's Education Division also was required to complete a membership application, sign and date it, and then submit it to a business agent.  In turn, the business agent was required to forward the application to the union for approval by the union's membership committee.  Membership in Local 1104 was effective upon the membership committee's approval of the membership application. The approval process consisted of the local's membership committee verifying the employment of an applicant by comparing the information on the membership application with SUNY's central list of employees to ensure that an applicant was employed in a non-supervisory position and, thus, eligible for membership.  After the approval process was completed, the union entered the names of those eligible

---

President Telecommunications Division were uncontested.

2

employees who had been accepted for membership in the union's GSEU membership data base. Subsequently, that information was forwarded to the local's Farmingdale, New York office for inclusion on Local 1104's membership mailing list. During the investigation, the business agent for the Education Division of the GSEU corroborated that the applications of those prospective members that were submitted to business agents or the union no later than the August 22, 2008 voter eligibility cut-off date should have been timely approved by the membership committee. He further stated that such individuals should have been admitted into membership no later than the eligibility cut-off date and mailed ballots. The investigation disclosed that, although 149 prospective members had submitted their signed and dated applications to business agents prior to August 22, 2008, there were delays with respect to business agents submitting the applications to the union. In particular, the business agents sporadically submitted the applications to the union on a "rolling basis;" meaning that such submissions occurred only after the business agents had accumulated a certain number of applications. As a result, the applications of prospective members that had been submitted to business agents as early as February of 2008 were not received by the union until after August 22, 2008. In addition to delays in the submission of the applications, the membership committee delayed processing and approving the applications after the committee received them.

The Department's investigation disclosed that the voter eligibility cut-off date was August 22, 2008; the ballot mailing date was October 10, 2008. All individuals whose membership applications had been approved by the membership committee on

3

or before the August 22 cut-off date were eligible to vote in the election, as membership in Local 1104 was effective upon the membership committee's approval of the membership application.[2] The investigation revealed that the applications of 149 individuals who had been submitted to business agents or to the union prior to the August 22 cut-off date were not approved by the membership committee until after that date. In some cases, the membership committee's failure to timely approve applications that had been submitted to business agents on or before the eligibility cut off was due to the business agents' delay in forwarding the applications to the union in a timely manner. Such delays occurred because the business agents submitted the applications to the union on a "rolling basis," only after the business agents had accumulated an undetermined number of applications. Consequently, the membership committee did not receive and approve such applications until after the eligibility cut-off date. In other cases, the membership committee's failure to approve the applications on or before that date was due to delays in the approval process. As a result of these delays, the applications of 149 prospective members that had been submitted to business agents or the union prior to the August 22, 2008 cut-off date were not possessed and approved by the membership committee until sometime before the October 10 ballot mailing. The membership applications of these 149 individuals eventually were approved by the membership committee and such individuals were admitted into membership before the ballots were mailed.

---

2 All SUNY employees in the collective bargaining unit become agency fee payers upon gaining employment with the university and paying the required fees. Such employees

The principal purpose of the LMRDA is to promote fair and democratic practices in unions. In this regard, the Act's adequate safeguards provision, 29 U.S. C. § 481(c), requires unions to have adequate procedures in place to ensure a fair and democratic election of union officers. *See also* 29 C.F.R. § 452.110. The investigation showed that the Act was violated in that adequate safeguards were lacking in the challenged election. The lack of such safeguards resulted from the business agents' delay in submitting 149 membership applications to the union or delays in processing and approving such applications. Such delays prevented 149 prospective members from becoming eligible voters prior to the voter eligibility cut-off date, as their applications were not approved by the membership committee until after that date. As a result, none of them were mailed ballots or voted in the election. Local 1104 should have had adequate procedures in place that would have facilitated in the timely submission of the membership applications by the business agents and the timely approval of such applications. However, the smallest vote margin for any contested race was 271 votes. Therefore, no violation occurred that may have affected the election outcome.

In addition, complainant Hayes alleged that the incumbent slate, "The Bloom Team," hung campaign flyers on the door handles of the interior and exterior doors at three academic buildings located on the SUNY Albany campus. This allegation was substantiated by the investigation. Section 401(c) of the Act, 29 U.S.C. § 481(c), requires a union to have adequate election procedures in place to ensure a fair election. The investigation disclosed that SUNY's written policy and Local 1104's collective

---

remain agency fee payers unless they become full members of Local 1104.

5

bargaining agreement with the university prohibit the posting of campaign materials at SUNY facilities. During the investigation, complainant Hayes stated that on or about October 15, 2008, she saw campaign flyers supportive of the incumbent slate hanging on the door handles of the interior and exterior doors at several academic buildings located on the SUNY Albany campus. Hayes could not recall how many flyers she encountered and provided OLMS with the names of two individuals who allegedly saw the flyers hanging on the door handles. OLMS was unsuccessful in its attempt to contact one witness. The other witness stated during the investigation that, on the evening of October 15, 2008, he saw approximately five pieces of the incumbents' campaign materials hanging on the door handles of various interior doors of the Arts and Sciences building located at the SUNY Albany campus. In addition, an incumbent officer acknowledged during the investigation that he posted 150 partisan campaign "door hangers" on the door handles of the interior and exterior doors of several academic buildings located on the SUNY Albany campus. Thus, although SUNY's written policy and Local 1104's collective bargaining agreement with the university prohibit the posting of campaign materials at SUNY facilities, the union violated the Act's adequate safeguards provision in failing to have adequate election procedures in place that would have allowed for the enforcement of SUNY's and the union's no campaign policy.[3] The union's enforcement of that policy may have discouraged, and possibly

---

[3] Section 401(g) of the Act, 29 U.S.C. § 481(g), prohibits the use of "employer" funds to promote the candidacy of any person in an election governed by the LMRDA. 29 C.F.R. § 452.78. Thus, a candidate is prohibited by the Act from using an "employer" facility to assist the candidate in campaigning unless such assistance is made available to all

6

prevented, the unlawful campaigning. The investigation disclosed, however, that the union's lack of adequate safeguards did not affect the election outcome. The investigation disclosed that 720 eligible members worked at the SUNY Albany campus during the election period. Of these members, 77 of them voted in the election. The smallest vote margin for any contested race was 271 votes. Thus, although 77 members may have been exposed to the unlawful campaigning, no violation occurred that may have affected the outcome of the election. Nor did the cumulative effect of these 77 tainted votes and the potential votes of the 149 members previously mentioned affect the outcome of the election (149 + 77 =226), as the vote margins ranged from 271 votes to 667 votes.

---

candidates. Section 3(e) of the Act, 29 U.S.C. § 402(e), defines "employer." This provision expressly excludes from the definition of "employer" "the United States or any corporation wholly owned by the Government of the United States or any State or political subdivision thereof." *See also* 29 C.F.R. § 451.3(a)(4). Although the governmental exception provision of section 3(e) excludes from the definition of employer a corporation wholly owned by the Government, section 3(e) of the Act does not expressly exclude from that definition corporations owned by a state or political subdivision. Thus, a corporation owned by a state or political subdivision is an "employer," for purposes of the Act, unless the corporation is itself a political subdivision of a state or an integral part of that state. *LMRDA Interpretative Manual*, §§ 030.210, 420. Relevant here, in 1948, the State University of New York (SUNY) was created and established by government enactment as a "corporation," pursuant to section 352, Article 8, Title I of the Consolidated Laws of New York. Based on this statutory provision, it appears that SUNY is a corporation owned by the state of New York or a corporation owned by a political subdivision of that state. Without the necessity of determining the "employer" status of SUNY under the LMRDA in the present case, SUNY would be an "employer" under the Act if the Secretary were to find that SUNY is not a political subdivision of the state of New York or SUNY is not an integral part of the state. Under those circumstances, section 401(g) of the LMRDA, 29 U.S.C. § 481(g), which prohibits candidates from using "employer" facilities to assist them in campaigning, also would be violated in that incumbent candidates used facilities located at SUNY Albany to campaign and such facilities were not afforded or

Complainant Hayes further alleged that incumbent business agent Arindam Mandal was provided an unfair advantage in the election when he was permitted to use the union's membership list to conduct campaign telephone calls. This allegation was not substantiated by the investigation. The anti-discrimination provision of section 401(c) of the Act, 29 U.S.C. § 481(c), requires labor organizations and their officers to refrain from discrimination in favor of or against any candidate with respect to the use of lists of members. The Department has interpreted this provision to require unions to be scrupulously evenhanded about the use of union membership lists. *See* 29 C.F.R. § 452.71. Thus, if a union permits any candidate to use a list of members in any way other than the right of inspection granted by the Act, the union must inform all candidates of the availability of the list for that purpose and accord the same privilege to all candidates who request it. *See* 29 C.F.R. § 452.71 (b). During the investigation, Local 1104 member Lina Rincon stated that, during the election, she received a call on her cell phone from someone who identified himself as Arindam Mandal, a Local 1104 business agent for the SUNY Albany campus. Rincon stated that, during the telephone conversation with Mandal, he mentioned the election but he did not actively campaign. Mandal stated during the investigation that he made campaign telephone calls to a handful of members. Mandal further stated that he obtained the members' telephone numbers from a publicly accessible SUNY website where graduate and teaching assistants are listed by department. The investigation showed that Rincon's cell phone number is listed on the website. The investigation did not disclose that Mandal used

made available to other candidates for similar purposes.

8

the union's lists of members to make any campaign telephone calls. The Act was not violated.

Finally, in an email received by OLMS on November 6, 2008, Victor Rosado, the losing candidate for Executive Vice President Education Division, filed a complaint with OLMS alleging that hundreds of Local 1104 members in the Education Division did not receive ballots or notice of the election by mail because the membership mailing list contained incorrect or bad addresses. This allegation was not substantiated by the investigation. The voter's rights provision of section 401(e) of the LMRDA, 29 U.S.C. § 481(e), provides that every member in good standing has the right to vote. In protecting union members' right to vote, the Act imposes an express requirement on a union to notify each member by mail at his last known home address of an upcoming election of union officer at least fifteen days prior to such election. *See* 29 U.S.C. § 481(e); 29 C.F.R. §§ 452.99-102. Before sending the notice of election to the last known address of each union member, a union is required to make reasonable efforts to update its mailing list. Not only must such updated information be used to mail notice of the election but, when, as in the present case, an election is conducted by mail ballot, such information must be used to mail a ballot to each eligible voter. The investigation disclosed that the union updated the information on its membership mailing list on a periodic basis. Several months prior to the election, Local 1104 again attempted to update its membership mailing list by obtaining current addresses for the 100 incorrect addresses on its mailing list. In particular, the investigation showed that Local 1104 business agents either spoke directly with the members for whom the union had bad addresses

9

and obtained current ones or, if business agents were not able to physically locate such members, the business agents emailed the members at the members' email address listed on the SUNY website and requested that their current addresses be forwarded to the union. As a result of these efforts, none of the 5,337 nominations/election notices that the union mailed to members on August 22, 2008, was returned to the union as undeliverable. Thus, the union made reasonable efforts to update and keep current the information on the membership mailing list before mailing the nominations/election notices to members.

Subsequently, on October 10, 2008, the union used the information on the membership mailing list to mail the ballot packages to the last known home addresses of members assigned to the three divisions comprising Local 1104 (Education Division, Operators Services Division and Telecommunications Division). The investigation showed that 54 ballot packages were returned to the union as undeliverable. The investigation did not disclose how many, if any, of these ballot packages belonged to members in the Education Division. In any event, the nomination/election notice that was posted at the work sites advised members to contact the election committee at the telephone number listed on the notice and request a duplicate ballot if a member did not receive a ballot in the mail. The election committee mailed a duplicate ballot to each eligible voter who requested one. The Act was not violated.

The Department has concluded from its investigation that Local 1104's October 30, 2008, election of officers, conducted under OLMS's supervision, was in compliance with Title IV of the Act and was conducted, insofar as lawful and practicable, in

10

accordance with the Constitution and Bylaws of Local 1104 and the Constitution of the Communications Workers of America. Therefore, no reason exists to overturn the results of this election.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 23rd day of April, 2010, in City of Washington, District of Columbia.

Cynthia Downing, Chief
Division of Enforcement,
Office of Labor-Management Standards,
United States Department of Labor

11